pelled to expend money as a condition of recovery of damages or reduction of rents.

We think the judgment should be affirmed with costs.

COOLEY and GRAVES, JJ., concurred.

CHRISTIANCY, J., did not sit in this case.

———◇———

## The City of Detroit v. The Detroit and Milwaukee Railroad Company.

*Streets: Statutory dedication.* The owners of a farm along the edge of which a railroad company owns a strip of said farm fifty feet wide, holding title to it as a right of way, occupying it with their track, cannot dedicate to the public as a street, any portion of such strip by any plat they may make, nor can they in any way affect the right of such company by any attempted dedication. There could be no dedication of it to the public except by the railroad company.

The owner of a farm (Antoine Dequindre) who had donated a strip thereof forty feet wide along the side of the same, upon conditions, to a railroad company, to be used under certain restrictions, for railroad purposes, subject to a reversion and right of re-entry to such owner or his heirs, in case of failure to perform or observe any of the stipulations, conditions or provisions, either of the act of incorporation of said railroad company or of the agreement by which such donation was effected, afterwards made plats of portions of said farm, leaving said forty feet strip, together with forty feet of the adjoining farm which belonged to another owner, open and unsubdivided, with three parallel lines running along the center of it, one to represent the division line between the two farms, and the other two, one each side of such division line, to represent the railroad track, with the words "Dequindre street" written in such open space along said forty feet, and the words "Railroad to Pontiac" on the other side of such railroad track. These plats divide the property into city lots, and show the various streets crossing the farm and such open space, and none of the lots, except three or four made irregular by a diagonal street, are made to front on such open space, but front on the cross-streets and lie lengthwise along such open space. These plats were each acknowledged as stated in the certificate "with the view to its being recorded according to law, but always upon, and subject to, this express condition (so far as regards Dequindre street on said plat and not otherwise) that said street laid down shall duly be and remain a public street or place, provided the Detroit and Pontiac railroad company shall in all respects comply with, perform, fulfill and keep all and every of the conditions, provisions and stipulations contained in certain articles of agreement" (the one above mentioned), "and that in the event of any breach or breaches on the part of said company in that behalf, that said street shall instantly revert to said Dequindre, his heirs and assigns, as his and their own private

DETROIT *v.* DETROIT & MILWAUKEE R. R. CO.

property, and that he shall take immediate possession thereof in all respects as if the same had never been embraced in said plat."

*Held*—That this language clearly withdraws and excepts the space marked as "Dequindre street" from the operation of the dedication intended to be effected by the plats with reference to other streets, and shows the intention of the proprietor not to dedicate it generally to the public as the other streets were intended to be dedicated.

*Held further*—That the strip of land, marked on said plat as "Dequindre street," was not by said plat, with such an acknowledgment, dedicated to the public in accordance with the provisions of the statute of this state then in force (*Sess. L. 1839, pp. 162, et seq.*) which provides that such plats shall particularly set forth and describe all the public ground within such plat by its boundaries, courses and extent, and whether it be intended for streets, alleys, commons or other public uses, etc.; and that the maps or plats made and acknowledged before the proper officer and certified under the hand of such officer "shall be deemed a sufficient conveyance to vest the fee of such parcels of land as therein expressed, named or intended to be for public uses, in the county in which such town lies, in trust to, and for, the uses and purposes therein named, expressed or intended, and for no other use or purpose whatever."

A plat which purports to have been made for the administratrix upon the estate of a deceased owner of a farm, which lays out no streets and does not sub-divide the property into blocks or city lots, but only into parcels of several acres each, and which was never acknowledged at all; and was apparently made with reference merely to a contemplated administrator's sale, cannot be the basis of a statutory dedication.

*Acknowledgment not under seal.* Whether an acknowledgment not under seal of the justice taking it, as required by the act then in force (*Laws of 1833, p. 531*, § 2) might be cured by the act of 1850, (*Comp. L., § 1146,*) for the time which elapsed after that act took effect:—*Quære?*

*Dedication in pais.* To render a dedication *in pais* effectual, there must be both an intent of the owner to dedicate, and the dedication must be accepted by the proper public authorities.

*User: Acceptance.* User by the public, so far as relates to the question of the acceptance of a dedication of city streets, is but evidence tending to prove acceptance, and does not, of itself, constitute it. This rule may be less stringent as to country roads, which are not so strictly and immediately under the official control of any board or local legislation, and upon which the expenditures to keep them up are comparatively small.

*Statute construed. Comp. L. § 1079* does not apply to streets in cities, and certainly not to streets in the city of Detroit, which, under its charter, has all along had control of the whole subject of streets and public grounds.

The user which would warrant the inference of an acceptance by the authorities of such a city, especially of a dedication so peculiar and conditional as the one in question, must be very extensive, continuous and general. User of the alleged street while it was a portion of a large open common, by travel over or across the common within and without the limit of the alleged street wherever the ground was best adapted to it, would not be sufficient.

Mention of the space left vacant on said plat, except what was occupied by the railroad, by the name of "Dequindre street" by the public generally, and also in the proceedings of the common council in describing other streets and work to be done between certain points on other streets crossing it, so long as no work was ordered to be done upon it, nor any sidewalks ordered constructed along its sides, nor any money appropriated or expended upon it, although during the same time sidewalks and crosswalks were ordered and constructed along said cross-streets across said space, would be insufficient.

DETROIT *v.* DETROIT & MILWAUKEE R. R. CO.

*Action of common council construed.* Where there was both a majority and a minority report of a committee appointed by the common council to inquire by what authority the railroad had taken possession of said alleged street, the majority report expressing the opinion that the street had been unequivocally dedicated to the public and that it was the duty of the city to maintain its free use to the people and recommending that legal measures be taken to test the matter, and the minority report, without expressing any opinion as to the legality of the dedication or the right of the public to it as a street, concluding that whether the company are entitled to it for their railroad, as well as whether it be a public highway, is a question of fact and to be determined between said company and the representatives of said Dequindre, deceased, and recommending no action to be taken by the common council, and both these reports were referred to the city attorney, who reported that he adopted as correct the report of the minority of said committee, and this report was adopted by the council, and nothing in any way contravening this action was done by the council; such action is evidence that the common council had not only not determined to claim the land as a street, but had deliberately decided not to assert a claim to it as such until the question should have been decided between other parties.

*Unaccepted proposition to dedicate.* Whether the conditions of said agreement had been performed or violated by the railroad company, it would have been competent for Dequindre, if not alone, at least with the consent of the company, to withdraw and put an end to the unaccepted dedication which was in the nature of a mere proposition, not binding until accepted; and it would be equally competent for his heirs or any of his or their grantees having the whole estate, to do the same thing.

*Effect of conveyances: The Watson deed.* Dequindre having conveyed in trust for his creditors, to one Desnoyers, the whole of said farm subject to his said agreement with the railroad company, which conveyance was in effect more in the nature of an incumbrance or security for those debts than of an absolute conveyance when the purposes of such trust were satisfied the lands remaining would belong in equity to said Dequindre or his heirs. And said Desnoyers, after the death of said Dequindre, having quit-claimed to the heirs of the latter, such heirs would become vested with the legal title, and would stand in the same position in respect to the strip of land embraced within said alleged street as Dequindre himself if living would have occupied, had he never executed the deed of trust to Desnoyers. And one Watson, having subsequently acquired all the right, title and interest of all said heirs in said strip of land, it was competent for him, so far as the city or the public were concerned, to rescind said agreement and to convey to the company, and having so conveyed, the company took the title to said strip of land clear from any obligation to the public which could have arisen from the proposed dedication.

*Selling lots by plats: Private and public rights distinguished.* The fact that Dequindre and Desnoyers and other parties holding title under them and Watson himself had sold lots according to, and under, the plats aforesaid, and that all the lots had been thus sold before the deed from the heirs to Watson, has no effect upon the rights of the public to the street. Whatever rights the purchasers of such lots may have acquired are private rights, and cannot be made the foundation of a public right in a suit brought by the city entirely in behalf of the public, and for the sole purpose of securing a public right.—*Smith v. Lock, 18 Mich., 56.*

*Complainant: Who proper party.* Whether, supposing the case made by the bill to be maintainable in other respects, and to be established by the proofs, the city, in its corporate capacity, was the proper or a competent party to bring this suit on behalf of the public:—*Quære?*

*Heard May 2 and 3. Decided July 7.*

Appeal in Chancery from Wayne Circuit.

The bill avers in substance:

1. That on May 24, 1836, Antoine Dequindre, then owner of the Dequindre farm, and the Detroit and Pontiac railroad entered into the agreement in writing, set out as Schedule A (a copy of which appears in the opinion).

2. That on April 2, 1836, said railroad company had acquired from the owners of the Witherell farm a right of way, fifty feet wide, along the westerly line of said farm.

3. That on June 11, 1836, said Dequindre, then being sole owner of the Dequindre farm, made a plat of that part of his farm between Larned street and the Detroit river, by which a strip eighty feet wide, half on the Witherell farm and half on the Dequindre farm, was left unsubdivided and marked and designated "Dequindre street;" along the center of which strip as marked out on said plat, one-half on each of said farms, is marked the track of a railway (a copy of which plat is annexed and marked "Schedule C 1"), with intent to dedicate the same to the public for a street in accordance with the true intent of his said agreement, "Schedule A."

4. That as early as the year 1838, said railroad company, under and by virtue of, and in accordance with, the said grant of the right of way and said agreement with Dequindre, laid down their track one-half on each of said farms, from the north line of the city to Jefferson avenue; and from Larned street to Jefferson avenue, said track ran on the line marked for a railway on the plat aforesaid.

5. That in October, 1836, Dequindre conveyed to Peter J. Desnoyers, subject to the said agreement, the whole of said farm, in trust, for his creditors, and that, on February 24, 1840, said Desnoyers and Dequindre made and duly acknowledged another plat of said farm, from North street

to the Detroit river, upon which was a strip of land eighty feet wide, extending from North street to the river,—forty feet on each of said farms,—marked "Dequindre street," with the line of the railway in the center as in the above plat (a copy of which plat is annexed and marked "Schedule C"), with intent to dedicate the streets, alleys and public places on said plat to the public.

6. That from the time of the dedication of Dequindre street, as aforesaid, said strip of eighty feet was used by the public as a street, subject to the user by the railroad company, under said agreement, of its track therein, without let, hindrance, obstruction or interference from any one, until 1851, when the railroad encroached on the use of the public, as hereinafter stated.

7. That said railroad company has now its track on said line between said two farms, from the north side of the city to Gratiot street; has had the exclusive and undisputed possession of forty feet off the east side of the Dequindre farm down to Gratiot street, from 1838 down to the filing of the bill of complaint; also the undisturbed possession of fifty feet off the west side of the Witherell farm, till 1851, when further arrangements with the owners of the Witherell farm were made, as hereinafter stated; that they ran their cars by horse-power over said track on Dequindre street down to Jefferson avenue until 1842, when they took up their track below Gratiot street, and did not relay it until the year 1851 or 1852, when they relaid it under the circumstances hereinafter stated; and that neither the possession nor the right of possession, by said company and your orator, of any part of the entire line of said Dequindre street, from the north line of the city to Detroit river, has ever been obstructed, questioned or disputed by the owners or any one interested in said Dequindre farm, from the time of the date of said Schedule A till the time of

filing this bill of complaint, except the claims of your orator, as herein stated, of your orator's rights under the said Schedule A and the dedications aforesaid.

8. That in 1843 Dequindre died intestate and insolvent, without having made any other disposition of said farm; that in 1843, by the consent of said Desnoyers and of all others interested in said farm, and through proceedings of the administratrix of the estate, a plat of that portion of the Dequindre farm north of North street was made, which left unsubdivided a strip forty feet off the easterly side thereof, with the words "Center of Detroit & Pontiac R. R." marked in its outer edge; that said last portion of said farm had all been sold according to said plat before the deed of the heirs of Dequindre to John Watson, hereinafter mentioned, and the heirs of Dequindre had also before that time sold all their interest in all the lots, blocks and sections of the entire Dequindre farm, according to the plats hereinbefore mentioned and set forth.

9. That, early in 1852, said railroad company, under claim of title by quit-claim deed, bearing date December 27, 1851, from John Watson, who, as agent of said company, had procured during the two previous years quit-claims from the Dequindre heirs of the strip forty feet wide along the easterly side of the Dequindre farm, resumed possession of their old line and track from Gratiot street to Jefferson avenue and extended it as far down as Woodbridge street, claiming to enter under said pretended title adversely to the city; that they sunk their track below the level of the street as it had been previously enjoyed by the city, and made excavations and embankments which utterly destroyed said street as a highway, rendering it impassable and useless as a street; that they turned off at Woodbridge street, laid their track down to Brush street, and established their depot there; that at this time they commenced running

with steam engines instead of horse-power, and from that time have claimed to exclude, and have actually excluded, the public from the use and enjoyment of every part of the street.

10. That in 1851, after such re-entry, the railroad company released and quit-claimed to the owners of the Witherell farm, their right of way on said farm, except as to twenty feet along its west side, and in return received from said owners a release of the right of way to said last mentioned strip; that said owners had previously dedicated to the public by plats, duly acknowledged and recorded, the last mentioned twenty feet strip, on which plats said twenty feet, together with the easterly forty feet of the Dequindre farm, were designated as "Dequindre street;" that Dequindre street, as a street sixty feet wide, has been left open and dedicated to the public by the owners of said farms, with intent to dedicate the same as a street, which said dedication has never been revoked, vacated or annulled, or in any way interfered with, by the owners aforesaid.

11. That the twenty feet so released by said railroad company has been sold by the owners of the Witherell farm, and has been since that time and is now held as private property in defiance of the rights of complainant by said purchasers thereof.

12. That the Detroit & Pontiac Railroad Company has become the Detroit & Milwaukee Railroad Company.

13. That both of said farms were embraced in the city limits prior to the time of the platting and dedication aforesaid, and still are within said limits.

14. That the defendant claims said forty feet of the Dequindre farm under said deed from said Watson; has excluded the public from the same and obstructed the same by laying its track, ditching, embankments and fencing; has claimed and exercised the privilege of running steam

engines, whereas the deed of said John Watson, as to the premises south of North street, is a nullity, and also to the part north of North street, conveyed only the legal title, subject to the legal obligation of Schedule A; that defendant, being in possession under Schedule A, could not by its own act acquire any title in derogation thereof, and that the deed of said Watson conveyed no title except in subordination to the rights of the complainant.

15. The prayer is that the defendant may be decreed to specifically perform and execute the stipulations, covenants, agreements and trusts in Schedule A, in which complainant is interested; to open Dequindre street eighty feet wide, forty feet on each of said farms, with its railroad track in the center, and devote and keep the same so that it shall remain a public street forever; to procure from the owners of said Witherell farm so much as shall be necessary to make such street, or, if unable to do so, to make compensation in damages; to remove all obstructions to the use, occupation and enjoyment by complainant of said strip eighty feet wide; to fill up all excavations on said street, and in every needful manner to protect complainant in the use of said street, consistent with the right of defendant to use the center thereof for its railway track, by the erection and maintaining of all suitable walls, bridges, street crossings, cattle-guards and other precautions necessary to the safety of the public; that the defendant be enjoined from the use of steam power in propelling its cars within the city limits and the boundaries of the said Dequindre and Witherell farms, and that the complainant have such other relief as is fit.

The answer in substance is as follows, viz:

1. Admits the present title of the company, admits the execution of Schedule A, substantially, and the acquisition of

the right of way along the Witherell farm, but avers the actual location of the line of road before the date of said instrument.

2. Admits the making of the plat of April 2, 1836, but denies that the same is correctly set out in the bill; sets out a true copy of the material part thereof; denies that the same had any legal effect to dedicate a street, or that Dequindre thereby intended to do so.

3. Admits the making of the Dequindre and Desnoyers plat; denies that the same is correctly stated in said bill; annexes a true copy of the material part thereof, and denies that the same had any legal effect to dedicate a street.

4. Denies that said strip of land ever became a public street, or was ever used by the public as such; admits that said railroad company, as early as 1838, had laid its track on the line of said farms down as far as Jefferson avenue, and used the same till 1842, when they ceased for a time to use that portion between Gratiot street and Jefferson avenue; that for a short time immediately after laying said track its cars were drawn by horses between Gratiot street and Jefferson avenue; denies that this was long continued; avers that long before 1842 its cars were drawn regularly over this part of the road by locomotives, with the full knowledge of Dequindre and complainant; denies that north of Gratiot street the road was ever operated by horse power at all; and avers that on May 13, 1836, the company acquired an undivided one-fourth of the Witherell farm, and had the same conveyed in trust to Alfred Williams, one of its officers.

5. That as the original terminus was found inconvenient by its remoteness from business, the company, under a grant from the city made in 1838, moved that portion of their track between Gratiot street and Jefferson avenue, and laid it down Gratiot street to the Campus Martius, but in so

doing did not abandon their right in, to, or over, the Witherell farm.

6. That the primary object of Schedule A was to secure the location of the railroad on the designated strip of land, and to devote it to the uses of the railroad, and not to dedicate any part of it as an ordinary public highway; that some of the stipulations of the agreement were found impracticable, and were mutually waived by the parties.

7. That the railroad company, in changing their track to Gratiot street, did not intend to abandon their rights in the Dequindre farm, or lose any rights, unless such should arise by operation of law, or the act of Dequindre, or his representatives, and they insist that it is now wholly immaterial what effect such change of track had on the rights of the parties.

8. Admits the death and intestacy of Dequindre in 1843, without having made any conveyance of the farm, except to Desnoyers, in trust; annexes a copy of the plat of that part of the farm north of Dequindre street; denies that said plat had any legal effect to dedicate said strip of land as a street; does not know whether the heirs of Dequindre sold the rest of their interest before the conveyance of Watson to the railroad company.

9. The Gratiot street track was used until about 1850, when the city revoked their license, and the track was removed, and the railroad company for a time ran their cars only down to Gratiot street; that the old line of the railroad from Gratiot street to Jefferson avenue remained open and unoccupied, substantially as it was in 1842, when the track was removed; that when the company began to take measures with a view to relay their track on that line, it found that John Watson and certain of the heirs of Dequindre claimed to own the strip of land in question, and especially that part from Gratiot street to the river, dis-

charged of all rights of the railroad company, or any one else, under Schedule A; that it was found that the legal title to said land had never been conveyed to the company, and that it would not be practicable to operate a large railroad on a right of way limited by such provisions as were contained in Schedule A, and that to remove all question about the legal rights of the company, as they were about to relay the track with new iron, and to establish a new depot, it was thought expedient to acquire the legal title from the holders thereof; that they were advised and believed that it was competent for the holders of the legal title, derived from Dequindre, to convey to them a clear title to said strip, and accordingly, on the 27th day of December, A. D. 1851, said company, in good faith, and for a valuable consideration, purchased the same from John Watson, in whom such title was then vested; denies that such title was taken subject to Schedule A, or to any rights or equities of the complainant; denies that the complainant then, or at any other time, had possession of any part of said strip, or that the same was used at all, or had ever been worked or graded, as a street; avers that when the railroad track was originally laid thereon it had been so ditched, embanked and excavated as to be wholly unfit for use as a public street, and so remained at that time; that the conveyances to said Watson, and by Watson to the railroad company, were duly recorded before, or at, that time.

10. That immediately after said purchase, said company entered upon said strip from Gratiot down to Woodbridge street, claiming to own the same, and, with full knowledge of complainant, proceeded to re-grade the same, so as to render a considerable portion wholly impracticable for any use as a public street, and in particular, with the knowledge and assent of complainant, sunk their track at Jefferson avenue so far below the natural surface of the soil as to

permit said avenue to be carried across the track by a bridge raised but little above the natural level; that with the assent of complainant the line was extended to their present terminus at Brush street; that such reconstruction and extension was made at great expense, in full faith that the company's rights were as herein claimed, with the full knowledge of, and without any objection from, complainant.

11. That on May 1, 1851, Alfred Williams conveyed to said railroad company the undivided fourth of the Witherell farm, which he held in trust for them; that some differences had arisen between the company and the other owners of said farm as to their respective interests, and by way of settlement, and for valuable considerations from the late Judge Witherell, the company did, on December 13, 1851, release to said Witherell all their interest in the farm, except a strip twenty feet wide along the west side thereof; and at the same time all the Witherell heirs, except Mrs. Hurd, executed a release to the company.

12. That the railroad so constructed has ever since been maintained, and the railroad possession uninterrupted; that the center of the track is on the dividing line of said farms; that the company has ever since maintained exclusive possession of the forty feet strip on the Dequindre farm; that the railroad company claimed to own a right of way fifty feet wide on the west side of the Witherell farm until their aforesaid release to Judge Witherell; that the possession of so much thereof as they actually occupied was undisturbed, though they did not actually occupy the entire width of fifty feet.

13. Denies that the owners of the Witherell farm dedicated the west twenty feet thereof as a street, or that they could do so without the consent of the railroad company; denies that a strip of land sixty feet wide from the north line of the city to the Detroit river has been left open by

the owners of said farms, with intent to dedicate the same as a street; annexes a copy of the material part of the plan of the Witherell farm, and denies that said plan, in fact or in law, dedicates said strip as a street; admits that north of Jefferson avenue the Witherell farm has been conveyed and is held as private property quite up to the line of said twenty feet strip.

14. Denies that the complainant has any rights or equities in the premises.

15. Admits that said farms are now within the city limits, and have been since 1857; that the Dequindre farm was within the city in 1835, and has ever since been; that the Witherell farm was included within the said limits by an act of the Legislature passed March 26, 1836; was detached by another act passed February 15, 1842, and was not again included within the city until the year 1857.

16. Avers that the complainant has not made any such case as entitles it to any relief, and prays that the defendant may have the same advantage as if it had demurred to the bill.

There was a general replication, proofs were taken, and at the hearing in the court below, the bill was dismissed.

*Joseph P. Whittemore*, for complainant.

I. The city is the proper party complainant.—*Attorney General v. Richards*, 2 *Ans.*, 615; 2 *Johns. Ch.*, 382; *Georgetown v. Alexandria Canal Co.*, 12 Peters, 98; *M. & M. R. R. Co. v. Ward*, 2 Black, 492; *Freeholders of Monmouth Co. v. Red Bank Turnpike Co.*, 18 N. J. Eq., 91; *Trustees M. E. Church v. Mayor, etc., of Hoboken*, 19 *id.*, 355; *Hart v. Mayor, etc., of Albany*, 9 *Wend.*, 571; *Trustees Watertown v. Cowan*, 4 Paige, 510; *Cincinnati v. White's Lessee*, 6 Peters, 431; 33 N. J., 13; *Webb v. Portland Manufacturing Co.*, 3 Sumner, 189; 15 Barb., 230; 28 *id.*, 228;

23 MICH.—24.

*11 Md., 128; 17 Ill., 249; 30 N. Y., 62; 20 Conn., 117; Walker v. Shepardson, 2 Wis., 384.* The defendant was a trustee for the public. The beneficiary is a proper party to sue for breach of the trust.—*Peer v. Kean, 14 Mich., 354.* This agreement for the benefit of the public is sufficient as a declaration of trust, and authorizes suit.—*In re Cressman's appeal, 42 Penn. St., 147; Balies v. Payson, 5 Allen, 473; 18 Texas, 736; Dover v. Fox, 9 B. Mon., 200; Jenkins v. Eldridge, 3 Story, 325; Orleans v. Chatham, 2 Pick., 29.*

II. The public are entitled to the easement as claimed in the bill of complaint. This appears: 1. By the terms of the Dequindre agreement, which declares an intent to dedicate the street as a public highway. 2. By the acts of the parties concerned, fully executing that intent, prior to the deed under which defendant claims to hold adversely. (*a*) The action of the railroad company in performance of the conditions of the agreement on its part. (*b*.) The action of Dequindre and his representatives in affirmance of that dedicatory intent. (*c*.) The action of the owners of the Witherell farm joining in the execution of that intent. (*d*.) The action of the public in the acceptance of the dedication, both by user, official recognition and regulation.

The Watson deed, unless given in affirmance of the original dedicatory intent, under the provisions ·of said agreement, was a fraud upon the public and upon the lot-owners to whom Dequindre and his representatives had sold out the entire estate. The policy of the law permits no such fraud to be perpetrated, and the dedication of the easement was complete when that deed was given.—*6 Pet., 431; 6 Mich., 184; 2 Doug., 283; 23 N. Y., 65; 29 Conn., 157; 7 Gray, 388, 73.*

III. The Watson deed was the deed stipulated for in the Dequindre agreement, the giving of which had been "suspended for a time," during the life of Dequindre. It was

not intended to confer upon the defendant a title adverse to the public, nor could it legally have that effect. 1. It is claimed in the answer to have been the deed due under the agreement; or at least, 2. It is clearly the conclusion from the proof that it was so given and received. 3. It is certain that the heirs and Watson had no *adverse* title to convey. They had nothing but the *naked legal title*, while the equitable title was vested in the defendant in trust, as aforesaid.—*12 N. Y., 121; 25 Me., 425; 1 Smith Lead. Cas. (5 Am. Ed.), 104; 9 Wheat., 325; 13 Met., 335; 18 Conn., 535; 18 Pick., 284; 2 Caines, 345; 21 Pick., 42.* 4. But if the heirs had any *beneficial* interest, it was, at most, a mere "unexercised option" to enter for precedent breach of the covenants of the defendant, which was not assignable or transferable; or, 5. If transferable to Watson, the option not being acted on by him before deeding, his deed to the defendant (who could not exercise an option to enter against itself for its own breach) extinguished the right. Moreover, 6. While the defendant held under the trust relations created by the agreement, for itself *and the public*, it was incapable of acquiring *any outstanding adverse title* which would not enure by force of the trust relations, to the benefit of the public, as a graft upon the trust estate already in its possession.—*1 Eq. Lead. Cas., 92, 221, 274, 210; Rothwell v. Dewees, 2 Black, 613; Baker v. Whiting, 3 Sumner, 475; 1 Story Eq. Jur., §§ 323, 1016; 4 How., U. S., 553-4 and note.*

IV. We ask that a commission be appointed to obtain such information for the court as shall enable it to prescribe in its decree for abatement of the purpresture maintained by the defendant, the manner in which the respective easements of the parties are to be enjoyed with respect to each other. This will not perceptibly differ from the office of a commission acting under an ordinary decree for a partition

between tenants in common. The difficulties in the way of effecting the purposes of the commission are no objection.— *2 Dan. Ch. Pr., 1382; Turner v. Morgan, 8 Ves., 144; Warner v. Bains, Amb., 589.*

*George Jerome, Ashley Pond* and *George V. N. Lothrop,* for defendant.

I. The complainant is not the proper party to bring this bill. 1. Whatever may be its exact character, it aims to assert some right or franchise of the public in the premises, as a *street* or public highway. The right, if any, is a *general public* right, and must be asserted in this court by some one who represents the whole public, or the sovereignty. 2. If there is an actual public highway, which the defendant obstructs, this is a public nuisance.—*4 Black. Com., 167; Adams' Eq., 210; 2 Story's Eq., § 923; Crowder v. Tinkler, 19 Ves., 621; State of Penn. v. Wheeling Bridge, 13 How., 590.* 3. But where the right set up in equity is one that belongs to the sovereign, the bill must be brought by the sovereign.—*Willard's Eq., 398; 2 Story's Eq., § 922; Georgetown v. Alexandria Co., 12 Pet., 98; Hale v. Cushman, 6 Met., 426; Smith v. Lockwood, 13 Barb., 220; Davis v. Mayor, 14 N. Y., 506; Doolittle v. Supervisors, 18 N. Y., 156; Roosevelt v. Draper, 23 N. Y., 318; Miller v. Grandy, 13 Mich., 550; Crowder v. Tinkler, 19 Ves., 621; Sampson v. Smith, 8 Simons, 272; Vestry of Bermondsey v. Brown, Law. Rep., 1 Eq. Cas., 212.* 4. The above principle is also recognized in that large class of cases which enable a private person to bring his bill in equity against a public nuisance, where it is also a *private* nuisance; that is, where it works him some special and peculiar injury. In such cases the bill is maintained against the nuisance as a private nuisance.—*Sampson v. Smith, 8 Simons, 272; Cook v. Mayor of Bath, Law. Rep., 6 Eq., Cas. 179;*

*Corning v. Lowery, 6 Johns. Ch., 439 ; Ketchum v. Buffalo, 14 N. Y., 356 ; Milhan v. Sharp, 27 N. Y., 188 ; Miller v. Grandy, 13 Mich., 548.*

II. Passing from the technical question of parties, let us look at the bill as one for specific performance in some other aspects. 1. Specific performance is a proceeding to enforce a contract. The bill can only be maintained by a party or a privy.—*Perkins v. Thorold, 11 E. L. & Eq., 278; Willard's Eq., 269.* 2. The contract must be a mutual one. There was no obligation on the city to accept the street.—*McMurtie v. Bennett, 1 Harr. Ch., 124.* And though the complainant, where the contract is severable, may, at his election, accept a partial performance, with compensation, where full performance is impossible,—*Covill v. Cole, 16 Mich., 233 ; Youell v. Allen, 18 Mich., 108,*— yet he must show a full performance, or readiness to perform, on his part.—*Adams' Eq., 82., and note 2 ; Willard's Eq., 291.* And it seems quite clear that a case like this, where the alleged fault, a neglect to open a street, is not a case in which the principle of equitable compensation can be applied in favor of the public. 3. The performance sought must be equitable under all the circumstances. If the complainant has delayed till the circumstances have changed to the disadvantage of the defendant, this form of relief will be denied.—*Willard's Eq., 280, 292, 295 ; The Mechanics' Bank v. Lyon, 1 Pet., 376 ; Pratt v. Carroll, 8 Cranch, 471 ; Porter v. Dougherty, 1 Casey, 405* ; *Brashear v. Gratz, 6 Wheat., 533* ; *Pickering v. Pickering, 38 N. H., 407 ; Chamberlain v. Livermore, 15 Mich., 381 ; Smith v. Lawrence, 15 Mich., 499.* Mere lapse of time is often a bar. —*B. & M. R. R. v. Bartlett, 10 Gray, 384; Watson v. Reid, 1 Russ. and M., 236 ; Morse v. Blake, 2 B. & Beat., 62 ; Heaphey v. Hill, 2 Sim. & S., 29.* 4. Specific performance is not an absolute right in all cases of contract, but

it is only decreed, where, on the special facts it will be just and equitable. (*a.*) The relief will not be granted except upon the equity of the whole contract.—*Willard's Eq., 291.; Slaughter v. Harris, 1 Carter, 238; Roy v. Willrich, 4 Sandf. Ch., 525.* (*b.*) As to the strip of land on the Witherell farm, a specific performance on the case made by the bill is impossible. (*c.*) Even as to the strip on the Dequindre farm, the relief sought is wholly inequitable, impracticable, and I think I may add absurd. Where the acts to be done are indefinite and future, this remedy is denied.—*Blackett v. Bates, 1 L. R., Ch. App. Cases, 117; P. C. R. R. Co. v. C. & T. R. R. Co., 13 Ohio St., 544.* (*d.*) I will only add here that I should be exceedingly surprised, if in any case, equity should, at this day, specifically decree a common use of a way for railroad · and highway purposes. Practically, they are inconsistent uses. And if attempted in cities, it .is attended with such hazard, and such constant conflict of rights, that a wise public policy should forbid all such attempts.

III. There was never a valid dedication of a street under the statute. 1. To make a statutory dedication, the statute must be strictly complied with.—*People v. Beaubien, 2 Doug., 258; Lee v. Lake, 14 Mich., 12; Belleville v. Starkey, 23 Ill., 441; Fulton Village v. Mehrenfield, 8 Ohio St., 410.* 2. The alleged street is eighty feet wide, half on the Dequindre farm and half on the Witherell farm. These were owned by different owners. And there is nothing which is claimed to be a plat in which the different owners joined. Of. course, then, there can be no one act which made a statutory dedication. The Dequindre plats must be confined to the west half of the supposed street. 3. The first Dequindre plat was made June 11, 1836, and the certificate of acknowledgment is not under seal. It is therefore invalid.—*Laws 1833, p. 533, § 2.* 4. The Dequindre and Desnoyers plat,

from the river to North street, was made February 4, 1840. In this case, the notary affixed a seal to his certificate. But the acknowledgment was not absolute and general, but special and conditional.

As to this plat I observe : *First*—This is not the laying out of a town under the statute of 1839. *Second*—The statute expressly requires the width and extent of a street so dedicated to be indicated with certainty. *Third*—The statute does not contemplate a conditional, limited or contingent dedication. *Fourth*—The devotion of land to the use of a railroad, and to an ordinary highway, are different things. The *use* in the two cases differs substantially.— *Cooley's Const. Lim.*, 547, et seq. ; *Trustees v. A. & R. R. R. Co., 3 Hill, 567 ; Williams v. N. Y. C. R. R. Co., 16 N. Y., 97 ; Carpenter v. O. & S. R. R. Co., 24 N. Y., 655 ; Mahon v. N. Y. C. R. R. Co., 24 N. Y. ; Wager v. Troy Union R. R. Co., 25 N. Y., 531 ; Springfield v. Conn. River Co., 4 Cush., 63 ; Troy v. Chesh. R. R. Co., 23 N. H., 83 ; Nicholson v. N. Y. & N. H. R. R. Co., 22 Conn., 74 ; Imlay v. Union Br. R. R. Co., 26 Conn., 249 ; Ford v. Chi. & N. W. R. Co., 14 Wis., 609 ; Pomeroy v. Chi. & Mil. R. R. Co., 16 Wis., 640 ; Tuto v. Ohio & Mis. R. R. Co., 7 Ind., 479 ; Scharmier v. St. P. & P. R. R. Co., 10 Minn., 82 ; Muffin v. R. R. Co., 16 Penn. St., 180.* *Fifth*—It is clear that if Dequindre contemplated any use whatever for an ordinary street, such use was not only conditional and limited, but also secondary and subordinate. Such a use is inconsistent with the one contemplated by the statute. *Sixth*—Again, where the statute operates, it vests the fee in the county in trust for the people. *Seventh*—The *use* contemplated by Dequindre and the railroad company was not the simple and well-defined use of an ordinary highway. In 1836 it was supposed to be entirely accurate to call a railroad a highway; and it is probable that it was the gen-

eral notion that the railroad use admitted under it other public highway uses. But the incongruity of the uses gradually became apparent, and are now fully recognized by the courts. The railroad use, by its imperative exactions, has excluded the other.—*Springfield v. Conn. R. R. R. Co., 4 Cush., 63; Williams v. N. Y. C. R. R. Co., 16 N. Y., 109; People v. Kerr, 27 N. Y., 205.* Eighth—If this plat dedicates any street, it is one not thirty, or forty, or sixty feet in width, but eighty feet. But Dequindre was not owner of any such width, and could not, under the statute, dedicate it. *Ninth*—The plat of 1844, which extends back from North street, does not purport to be a town plat or statutory plat at all. It is merely a surveyor's plan for the purpose of sale. So far as the Dequindre strip in concerned, there is no ground for claiming it as a street by statutory dedication.

IV. I now proceed to inquire whether the Dequindre strip ever became a street by a dedication *in pais.* 1. To pass a title to the public by acts *in pais,* there must be acts of dedication, with intent to dedicate by the owner, and acceptance by the public, through the proper authorities.—*People v. Beaubien, 2 Doug., 285; People v. Jones, 6 Mich., 176; Cook v. Hillsdale, 7 Mich.; People v. Tillman, 12 Mich., 401; Lee v. Lake, 14 Mich., 12; Penquite v. Lawrence, 11 Ohio, N. S., 274; Brown v. Worcester, 23 Gray, 31; Holmes v. Jersey City, 1 Beasly, 299; Logansport v. Dunn, 8 Ind., 378; Badeau v. Mead, 14 Barb., 329; Clements v. Tracy, 16 Barb., 257; Holdane v. Coldspring, 21 N. Y., 474; Fonde v. Borst, 2 Keyes, 51.* 2. Now, up to the time that the track was turned down Gratiot street, there is no room to assert any such acts of dedication *in pais.* All that Dequindre did is to be referred to the agreement. He intended nothing except what he had there done. But even if he intended by any act to dedicate,

until met by the public acceptance, it was a mere offer, which he was at liberty to withdraw.—*People v. Beaubien, 2 Doug., 285; Lee v. Lake, 14 Mich., 17; Lee v. Sandy Hill, 40 N. Y., 442.* 3. In 1842 the railroad ceased to occupy the line below Gratiot street. In 1843, Dequindre died. At this time there is no pretense of public acceptance. If any offer to dedicate is sought to be drawn from the agreement, that offer now ceased. The sole condition on which it was made having ceased, the offer fell by its own terms. It certainly was never renewed. 4. The conveyances by the heirs of Dequindre were express acts of private ownership and authority. They overthrow all the pretended evidence of dedication from *user.* They are acts which unequivocally look to an assertion of whatever title they had in this property.—*Underhill v. S. & W. R. R. Co., 20 Barb., 445; Hooper v. Cummings, 45 Maine, 359; Poole v. Huckisson, 11 M. & W., 830.* 5. It seems to me too idle to claim that this ever became a highway by user alone. There is, I think, really no user proven beyond what might be shown over any open grounds over which people find it convenient at times to pass. But even if we concede user to some extent, yet the alleged acts of user are neither decisive enough, nor general enough, nor long, enough continued.—*Gould v. Glass, 19 Barb., 179; Smith v. State, 3 N. J., 130; Hoole v. Attorney General, 22 Ala., 190; Kilburn v. Adams, 7 Met., 39.* The mention of "Dequindre street," in the resolutions of the common council, as a boundary, or as a local designation, is clearly neither user nor acceptance.

V. In April, 1848, the commissioners for partition of the Witherell farm made a "Map of division and partition" of the farm, which was subsequently signed and acknowledged by the heirs. This farm was then in Hamtramck. It is not laid out "as a town or village, or as an addition

23 MICH.—25.

to any town or village or city." There is not any street
laid out by it; and it only shows crossing it Gratiot street,
Jefferson avenue and Atwater street, all of which were then
existing. This map is just what it purports to be, a plat
of partition, and the signing and acknowledging it by the
heirs was for purposes of authentication of it as a muni-
ment of title in the partition. It seems idle to talk about
this as a statutory town plat. It is neither such, nor intended
as such. But even if it had been intended as a statutory
plat, it would have been a nullity. The grant of the right
of way was in force. And without the concurrence of the
railroad company, no valid plat could be made. So far as
the owners of the Witherell farm are concerned, there is no
color for claiming a dedication, either by statute or by acts
in pais.

VI. I now return to consider the effect of the failure
of the railroad company to observe some of the conditions
of the Dequindre agreement. 1. It is first to be observed
that these conditions only affected the Dequindre strip.
2. The principal breaches were: *first*, the use of locomotives
within two miles of the river; and, *second*, the diversion of
the track to Gratiot street in 1842. 3. The agreement
declared that for these things the whole right of the rail-
road under the agreement should cease and the title revert.
Dequindre might have taken advantage of these things and
insisted on them as a forfeiture. But it is certain that he
did not. This right was personal, and no one but Dequindre
could take advantage of it.—*Nicol v. N. Y. & E. R. R., 12
Barb., 460 ; 12 N. Y., 121 ; Boyer v. Tresler, 18 Ind., 260 ;
Webster v. Cooper, 14 How., 501.* He also could waive it.
And his conduct will warrant the inference of such waiver.
—*Ludlow v. N. Y. & N. H. R. R. Co., 12 Barb., 440.*
The right of re-entry, on condition broken, is not an estate,
but only a personal right.—*Nicol v. N. Y. & E. R. R., 12*

*N. Y., 121; Hooper v. Cummings, 45 Me., 359; Underhill v. S. & W. R. R. Co., 20 Barb., 455; Tinkham v. E. R. R. Co., 43 Barb.* At any rate, it could be asserted only by the holders of the Dequindre title. To secure against this, the railroad acquired this title in fee by Watson's deed of December 27, 1851. But the bill claims that this title was acquired subject to the agreement of 1836. This is preposterous, as stated. The evident object of the purchase was to avoid the danger to which that agreement exposed them. And the clear effect was to destroy that agreement, at least as to Dequindre's rights. All that can be plausibly asserted is that the conveyance was subject to such rights as the public had in the premises.

VII. There is no ground for assuming, in any possible aspect of the case, that the railroad company received this land in trust, to open or make a street of it. No such idea or intention ever entered the minds of the parties. If there is an actual street, there can be no question of trust. For if dedicated under the statute, the fee is in the county, and is subject to the easement in the people. If a street by dedication *in pais*, the easement is in the people, and the fee is subject to it as a servitude.

CHRISTIANCY, J.

As an abstract of the bill and answer (to which we refer) will accompany the report, we do not deem it necessary to incumber the opinion by their recital here.

It is sufficient to say that it is a bill filed by the city of Detroit, in its corporate capacity, to enforce what is claimed to be the right of the public to a street upon a certain strip of land of forty feet in width, on, and along, the east side of the Dequindre farm, in the city of Detroit, and a strip of equal width on, and along, the west side of the adjoining farm, known as the Witherell farm, and

extending from the north line of the city to the Detroit river, subject to the admitted right of the defendant to maintain its railroad track on the line between the Dequindre and Witherell farms, in the center of such eighty feet strip.

The bill bases this claim mainly upon the following agreement between Antoine Dequindre, then owner in fee of the Dequindre farm, and the Detroit & Pontiac Railroad Company (through its agents), of which agreement it asks a specific performance, it being admitted that the present defendant, "The Detroit & Milwaukee Railroad Company," is the successor of the former company, with its rights and liabilities.

The agreement is in the following words: "Articles of agreement made and executed this 24th day of May, 1836, between Antoine Dequindre, of the city of Detroit and territory of Michigan, of one part, and the Detroit and Pontiac Railroad Company, of the other part.

"Whereas, by an act of the legislative council of the territory of Michigan, entitled an act to incorporate the Detroit and Pontiac R. R. Co., and approved on the 7th day of March, 1834, said company was incorporated for the purpose of constructing a railroad from the city of Detroit aforesaid, to the village of Pontiac, in the county of Oakland, with power and duties particularly specified in said act; and whereas, in pursuance of such power, it had been deemed advisable by the company to construct part of said road through the property of Antoine Dequindre, and the said Antoine hath agreed to donate the land and lots hereinafter particularly mentioned upon the conditions following, that is to say:

"1st. That the said railroad shall be constructed, used and put in operation, conformable in all respects to the provisions of said act of incorporation, its present charter.

"2d. That the railroad shall be so laid, as, in its approach to Detroit from Pontiac, to strike on the property of said Dequindre, at the north extremity of the boundary line between the Dequindre farm and the farm adjoining thereto, lately owned by James Witherell, and shall run thence along said boundary line into the city of Detroit and terminate at Atwater street, at the point of its intersection with said railroad.

"3d. That said railroad shall be so far of the width of eighty feet, and shall be laid equally on the farm of Dequindre and those adjoining.

"4th. That said railroad company shall procure from the owners of said adjoining farm, a good title to so much thereof as shall be necessary for the construction of said road.

"5th. That the first track of railway laid down by said company shall be on the boundary line; and when there are two tracks the same shall be equally on both farms, on either side of said line and as near thereto as practicable, leaving a street at each side of the outer side of said tracks.

"6th. That the said railroad shall at all times, after its completion, be kept open in good repair and in operation until the termination of the company's charter; and all cars and carriages thereon shall be drawn by horses, from Atwater street aforesaid, for a distance of two miles, or so much further as the said Dequindre may require, whenever he shall deem it necessary; and within that distance no steam-power shall be used on said road.

"7th. That the strip of land to be donated by said Dequindre and the owners of the adjoining farm for the purpose of laying out said railroad thereon, shall be deemed, and shall be and remain, a public street forever, to all intents and purposes, subject, however, to reversion to said Dequindre or his heirs, pursuant to the 10th article hereinafter men-

tioned, and shall be called and known as Dequindre street, and no branch or branches or other railroads shall intersect the same or branch off therefrom; but the sole terminating point thereof in the city of Detroit, within eight miles thereof, shall be Atwater street aforesaid, where, alone, all the deposits of the company shall be kept, their business done and their buildings erected, for which purpose they shall purchase sufficient real estate.

"8th. That all fencing of every description on the land to be donated by said Dequindre, shall be and remain his sole property, with liberty to him to remove the same; and so much of the timber and wood cut down thereon as shall not be needed and used for the construction of said road shall also be and remain the sole property of said Dequindre, and shall be removed to his said farm by, and at the expense of, the said company.

"9th. That Stewart, Brown, Sheldon, Buel, Bacon, Howard and Morse shall severally carry into full effect and in good faith their respective proposals to said railroad company as contained in their original proposal, a copy of which is hereto annexed, and no conveyance thereof or of any part be made by said company to the said persons or any of them.

"10th. That in case of non-observance or non-performance of any of the stipulations, conditions or provisions, either of the said act of incorporation or of this agreement, on the part of the company or their agents, or by, or under, their authority, the donations to be made by said Dequindre to said company and all instruments conveying the same, shall become and be absolutely null and void, to all intents and purposes, and inoperative in any court; and the land thereby conveyed shall revert, and be, from the time of such failure or breach, absolutely and legally vested in said Dequindre, as fully to all intents and purposes as if he had

never conveyed the same; and he, or his legal representatives, shall have a right immediately to enter thereon; and the said donations are to be wholly upon this express understanding, anything herein contained to the contrary in any wise notwithstanding.

"11th. That on the execution hereof, or whenever the said company shall require the strip or piece of land of forty feet hereinafter mentioned for the purpose of constructing said railroad, that they may enter thereon for such purpose; but no deed or title shall be given thereof until the entire road shall be put into entire operation conformable to its charter; and it is hereby further agreed by and between the parties hereto, that upon the condition aforesaid, and none other, and so soon as said railroad shall be constructed and put into operation by said company conformable to its charter, the said Dequindre shall and will execute to said company a quit-claim deed of a strip or piece of land commencing at a point where said railroad shall, so as aforesaid, strike his said farm, and running thence along the eastern boundary thereof dividing the same from the aforesaid Witherell farm, in a straight line with Atwater street aforesaid, being forty feet in width from said line, the same to be and form one-half of the aforesaid street to be called Dequindre street; and further, that he, the said Antoine Dequindre, shall and will execute to Alfred Williams, as trustee for said company, a quit-claim deed of forty lots, each fifty by one hundred feet, and no more than eight thereof to be situated in one block or one square of lots as finally to be laid out or surveyed by, or on behalf of, said Dequindre, eight of the same to be north of the Gratiot road, the remainder thereof to be south of aforesaid road, and all aforesaid lots to be at the selection of said Dequindre or his representatives, except so far as is restrained hereby; provided that both said deeds shall be

subject to the aforesaid conditions, and be declared void as expressed in the foregoing 10th article; and said company do hereby covenant and agree to, and with, said Dequindre and his legal representatives, that they, the said company, shall well and truly keep, perform, fulfil and abide by all and singular the several conditions, agreements and matters aforesaid. In witness, etc. (Signed) Antoine Dequindre.   G. O. Whittemore, Sherman Stevens, agents for company."

The first question for our consideration is, whether this strip of land, or any, and what part of it, was dedicated to the public as a street, by the owner or owners, by a regularly executed and recorded plat, according to the statute then in force, so as to make an effectual *statutory dedication;* and if not, then, secondly, whether there has been a dedication *in pais,* duly accepted by the proper authorities on the part of the public.

But, as this alleged street is one having emphatically two sides, with a railroad rightfully existing in the middle, the easterly side or portion being on the Witherell farm, and the western on the Dequindre farm, it will be best to dispose of the question of dedication as to each side, separately; and, as that upon the Witherell farm is most readily disposed of, and its disposition will disencumber the case of some extraneous matter, we will first consider the question of dedication as it relates to that.

Complainant's counsel claims that this dedication (or rather of the twenty feet only along the west side of the farm) was effected by certain plats executed and acknowledged by the various owners of that farm, all of which plats, upon examination, appear to have been made between June, 1848, and June, 1851. But the bill itself shows that during this time and until the railroad company released all but twenty feet (which complainant's evidence shows was December 13, 1851), the railroad company held the

title to the right of way for their road, to a strip fifty feet wide on the Witherell farm and along the west line of it, and the answer virtually admits it. The bill also further makes it a subject of complaint against the company that it released and gave up to the owners of the Witherell farm all this strip of fifty feet except the western twenty feet, along the line of the farm; this is claimed as a violation of the company's agreement with Dequindre; and the bill even prays that the company be decreed to purchase enough of it back, to make a strip forty feet wide next to the line for said street.

The bill also shows that the company had laid down their track along the line, and were, at the time these plats were executed, in actual possession of the road down, at least, as far as Gratiot street.

Upon the case made by the bill, therefore, the company being the owners of the whole strip of fifty feet along the west line of the farm, holding the title to it as a right of way, the owners of the Witherell farm had no power to dedicate it to the public, by any plat which they could make; nor could they in any way affect the right of the company by any attempted dedication. Complainant must succeed, if at all, upon the case made by his bill, and is not at liberty to make a new case by the evidence unsupported by, and directly repugnant to, the allegations of the bill. But complainant's counsel does not claim to have made a different case by his evidence, and still insists, upon the argument, that the company owned the fifty feet right of way at the very time these plats were executed.

So far, therefore, as relates to the question of a statute dedication by plat, one side of the alleged street—all that portion on the Witherell farm—may be laid aside as out of the case. There could have been no dedication of it to the public at any time during which it is important to inquire,

either by plat under the statute, or *in pais*, unless that dedication was made by the railroad company.

We will now pass over to the other side of the alleged street and consider the question of a statutory plat and dedication of that portion situated upon the Dequindre farm.

After his agreement with the railroad company above set forth at large, Dequindre, on the 11th day of June, 1836, made and recorded, in the office of the register of deeds, a plat of so much of said Dequindre farm as lay between .Larned street and the Detroit river; on the east side of which plat appeared an open space of eighty feet in width (not subdivided into lots), running the whole length of the plat, one-half, or forty feet only, of which appeared to be on the Dequindre farm, and forty feet on the Witherell farm (which of course Dequindre had no authority to plat). In the center of this strip of eighty feet (or on the line between the two farms) were drawn three parallel lines,— the center one of which would seem to indicate the line between the farms and the two others (one on each side of it) the railroad. On and along the west side of the whole eighty feet strip (being the part west of the railroad and on the Dequindre farm), were written the words "DEQUINDRE STREET," and on and along the east side (on the Witherell farm), in the open space then left, were written the words "RAILROAD TO PONTIAC." The peculiar form of the acknowledgment to this plat will be noticed hereafter.

After the making of this plat, Dequindre, in October, 1836, conveyed to Peter J. Desnoyers, in trust for his (Dequindre's) creditors, the whole of said Dequindre farm, subject, however, to the agreement with the railroad company. And in February, 1840, Desnoyers and Dequindre joined in the execution of another plat, embracing all that part of the Dequindre farm lying between North street and

the Detroit river (including the same portion previously platted by Dequindre, without altering it in any way material to the present case, and also including three or four times as much more further north, which had not been previously platted).

This latter plat marks the strip of eighty feet along the east side, precisely as upon the plat just mentioned, made be Dequindre alone.

Both plats divide the property into lots of appropriate size for city purposes, and show the various streets crossing the farm and crossing the space in question. But none of the lots (except three or four fractional lots made irregular by Gratiot street) seem to front on the space called "Dequindre street," but all, with the above exceptions, are made to front on the cross-streets, and those adjoining the space in question lie lengthwise along said space, which appears to form the side lines of such abutting lots. This plat was recorded February 4, 1840. Its peculiar acknowledgment will be noticed further on.

Another plat is relied upon by complainant's counsel for the balance of the farm. Dequindre died in 1843, and in 1844 a plat seems to have been made of the rear of the farm (not before platted) "for the administratrix on his estate." This was recorded in 1844, but was *never acknowledged at all*. It lays out no streets, nor does it subdivide the property into blocks or city lots, but only into parcels of several acres each. It was probably made with reference to a contemplated administrator's sale. The legal title was at this time in Peter J. Desnoyers, and the authority of the administratrix to make and record any plat dedicating any right to the public, does not appear. Very clearly, there was no statute dedication by this plat. The question of a statute dedication is, therefore, narrowed down to the two plats, one executed by Dequindre alone, and the other by

him and Desnoyers, both of which are above described. We will now examine the peculiar acknowledgments of these plats and the provisions of the contract of Dequindre referred to, and adopted by the acknowledgment.

The acknowledgment to the first plat—that executed by Dequindre alone—is not under the seal of the justice taking it, as required by the act then in force (*Laws of 1833, p. 531, § 2*). This, however, might possibly, if it were the only defect, be cured by the first section of the act of 1850 (*Comp. L., § 1146*), for the time which elapsed after that act took effect. But it is unnecessary to consider this question, as the same ground was re-platted by the plat made by Dequindre and Desnoyers jointly, in 1840, the acknowledgment of which is under the seal of the notary taking it, according to the law of *1839, p. 162, § 2.*

The main question as to these plats arises upon the purposes and conditions of the supposed dedication, as expressed in the acknowledgment, which is precisely the same, in effect, upon both these plats; and it is, therefore, only necessary to examine that to the plat made by Desnoyers and Dequindre in 1840. It is in these words:

"State of Michigan, County of Wayne, ss.—Be it remembered, that on this fourth day of February, in the year one thousand eight hundred and forty, came before me, the undersigned, a notary public in and for said county, Antoine Dequindre and Peter J. Desnoyers, his assignee, known to me to be the persons mentioned in the within town plat, and to whom the same belongs, and severally acknowledged the same to be their act and deed, with the view to its being recorded according to law; but always upon, and subject to, this express condition (so far as regards Dequindre street on said plat and not otherwise), that said street laid down shall duly be and remain a public street or place,

provided the Detroit and Pontiac Railroad Company shall in all respects comply with, perform, fulfill and keep all and every of the conditions, provisions and stipulations contained in certain articles of agreement made and entered into between them and said Antoine Dequindre, bearing date the 24th day of May, A. D. one thousand eight hundred and thirty-six, to which reference is here made for greater certainty, and that, in the event of any breach or breaches on the part of said company in that behalf, that said street shall instantly revert to said Dequindre, his heirs and assigns, as his and their own private property, and that he shall take immediate possession thereof, in all respects as if the same had never been embraced in said plat. George R. Griswold, [ L. S. ] Notary Public, Wayne county, Michigan."

This language in reference to Dequindre street is so plain and explicit that it cannot be misunderstood. It clearly withdraws and excepts the space on the Dequindre farm marked as "Dequindre street" from the operation of the dedication intended to be effected by the plat with reference to *other* streets, and shows in the clearest manner the intention of the proprietors *not to dedicate it generally* to the public, *as the other streets were intended to be dedicated.* It adopts the provisions of the articles of agreement between Dequindre and the railroad company, and dedicates it *only* to the purposes of that agreement, and subject to all the conditions of that agreement, and makes the dedication, or rather the use which the public are to be permitted to enjoy in it, depend upon the performance, in all respects, by the railroad company, of "every condition, provision and stipulation contained" in it, and provides for its immediate reversion to Dequindre and his heirs, upon any breach of, or failure to perform, any such condition, provision or stipulation.

It was one of the provisions of said agreement, that upon

the conditions therein mentioned, as soon as said railroad should be constructed and put in operation conformable to its charter, said Dequindre was to convey the whole of said strip of forty feet in width to the railroad company.

By the third article of the agreement (and its reference to the second) it will be seen that the company are required to have "*their railroad*" laid out eighty feet wide from the north line of said Dequindre farm to Atwater street, and to be equally on said farm and those adjoining. Whatever else may be said of this very peculiar agreement, or of its true construction in other respects, it is clear that the title was to vest in the company, subject to the continued performance by the company of all the conditions; that the main and primary object and use to which the strip of land was to be devoted, was for the use of the railroad or the railroad company as a right of way, and that any other public use contemplated as a mere street was a secondary and subordinate or incidental use, which should cease whenever the railroad company should forfeit the right to its use for railroad purposes.

The only law in force governing the execution and recording of town plats and dedication thereby to the public at the date of Dequindre's agreement (1836) and when his first plat was recorded, was that of 1827, found in the *Laws of 1833, p. 531;* and in 1840, when the Dequindre and Desnoyers plat was recorded, the only law upon the subject was the act of April 19, 1839 (*Laws of 1839, p. 162, et seq.*), the second section of which is identical with the second section of the law of 1827 (except as to certain officers before whom the acknowledgment may be taken).

The first section provides " that whenever any town shall hereafter be laid out within this state, the proprietors of such town shall cause a true map or plat thereof to be recorded in the registry of the county where the same lies, before any

lot or lots therein be offered for sale; and if any person or persons shall sell or offer for sale any lot or lots within such town, before the same be recorded as aforesaid, such person or persons shall forfeit and pay a sum of ten dollars for each lot so sold."

For the purposes of this case we shall take it for granted that this section (which in this respect governs the scope of the act) may apply to a plat of a small part only of a town or city, as in the present case.

Section two of the act is in the following words: "That such maps or plats, as are by this act required to be recorded, shall particularly set forth and describe all the public ground within such town by its boundaries, courses and extent, and whether it be intended for streets, alleys, commons or other public uses, and all the lots intended for sale by progressive numbers, and their precise length and width; and the maps made and acknowledged before a justice of the peace, a notary public of the proper county, where the town lies, or before any judge of any court of record, and certified under the hand and seal of the judge, justice or notary public taking such acknowledgment, and recorded, shall be deemed a sufficient conveyance to vest the fee of such parcels of land as therein expressed, named or intended to be for public uses, in the county in which such town lies, in trust to and for the uses and purposes therein named, expressed or intended, and for no other use or purpose whatever."

It can need little argument to show that the strip of land in question marked on these plats as "Dequindre street" (or rather that portion of it on the Dequindre farm) was not by these plats (thus acknowledged) dedicated to the public in accordance with these statute provisions. The statute clearly contemplates no such conditional dedication by which the rights of the public are made depend-

ent upon the action of third parties, over which the public can exercise no control, and who might forfeit all the public right at any time, and after any amount of public money had been expended in fitting it for public use. The statute contemplates an absolute dedication, defeasible only, if at all, by the acts or omission of the public, such as abandonment by non-user or otherwise

Again, the statute has taken care to provide against any resumption by the grantor, or reversion to him, without the assent of the public, by an express provision that the dedication which it provides for, "shall vest the fee in the county, in trust to, and for, the uses therein named."

By this plat, and what is claimed to be a dedication effected by it, the fee was to be vested in the railroad company, subject to defeasance by the non-performance of any of the conditions mentioned. There are some other particulars in which these plats fail to comply with the statute in question; but we deem it unnecessary to notice them, as we think those already mentioned are conclusive.

The matters above pointed out as not in compliance with the statute, are matters which affect the very *substance* of the transaction, the *intent to dedicate;* they are not mere formal defects or a failure to acknowledge according to the statute, which the statute of 1850 (*Comp. L.*, § *1146*) was intended to cure. It would hardly be in the power of the legislature to convert what was so plainly intended as a mere conditional disposition of this property into an absolute dedication, taking away the right of reversion expressly stipulated for, on the breach of any of the conditions. This disposes of the question of a statute dedication, and shows that no part of the alleged street has been thus dedicated.

We are next to inquire whether there has been a dedication *in pais;* to render such a dedication effectual, it is

necessary, first, that there should be an *intent* of the owner to dedicate; and, second, that the dedication should be accepted by the proper public authorities. Here was certainly no intent to dedicate, except subject to the conditions mentioned. The question of acceptance will require further consideration.

The bill itself can hardly be said to make a case of dedication *in pais*, but apparently rests the whole claim to a dedication upon the several plats which it alleges were executed "according to the statute in such case made and provided," and upon user of the land by the public as a street. But it nowhere alleges any acceptance of the dedication by the proper public authorities, a fact essential to the public right under any dedication *in pais*, of land for public uses in cities having a regularly organized city government, nor any fact which, of itself, constitutes such acceptance,—such as the taking the actual charge and management or the regulation of it, or making improvements upon it.—*People v. Jones, 6 Mich., 176; Tillman v. The People, 12 Mich., 401; Lee v. Lake, 14 Mich., 12.*

But user by the public, that is, travel over it by the public, is the only fact alleged which can be claimed to bear upon the question of acceptance. This, at the most, so far as relates to the question of the acceptance of a dedication of city streets, is but *evidence* tending to prove acceptance, but of itself does not constitute it.

As to country roads which are not so directly and immediately under the official control of any board or local legislation, and where the expenditures to keep them up are comparatively small, public user alone may, perhaps, properly be held, when sufficiently general and long continued, to constitute an acceptance of a dedication to such public use; but this in many, if not most, of the states, depends much, if not wholly, upon statutes, which recognize

28 MICH.—27.

the public user for a certain specified period, as of itself constituting a highway, and therefore may be said to leave no question of acceptance open to the authorities.—*Green v. Town of Canaan, 29 Conn., 157*. Such a provision is found in § *1079, Compiled Laws;* and we had previously several other similar statutes. But these provisions do not apply to streets in cities, which are regulated by the special or general powers granted by their respective charters; and certainly, we think, they do not apply to the streets of the city of Detroit, which has all along had control of the whole subject of streets and public grounds under its charter. It might lead to great confusion, and be very prejudicial to the interests of the city, if the acts of individuals composing a part of the public could, by merely traveling over a certain route upon their own individual responsibility, and without any authority from, or accountability to, the proper city authorities, bind the latter to accept as a public street, any route over which they might thus choose to travel, and thereby impose upon the city the expense and responsibilities incident to an established street. And it might lead to especially injurious consequences if the city authorities could thus be bound and held to have accepted such a conditional dedication as this was, if it were a dedication at all. I do not mean to say that the user might not, in some special case and under special circumstances, be so extensive, continuous and general as properly to warrant the inference of an acceptance by the proper authorities. But their acceptance of such a peculiar and conditional dedication as that here in question, is not to be inferred from slight evidence.

The public user alleged in the bill is confined to the period commencing about the time of the alleged dedication, and extending down to the time when the company, having obtained the deed from Watson (which was in 1851),

when the bill alleges the company actually excluded the public from the use and enjoyment of the street and every part and portion thereof, from the north line of the city to Atwater street (which is the whole length of the street as claimed), and has itself occupied and enjoyed the said street for its own benefit and advantage, to the utter exclusion of the public therefrom. Of course any acts of user *after that period* cannot be considered, as they would contradict instead of supporting the case made by the bill. There is another reason for confining the acts of user to the same period, which will appear when we come to consider the Watson deed.

We have carefully examined all the evidence during this period, and, though it is somewhat conflicting, we do not think it satisfactorily establishes such general public user, especially within the definite limits of the eighty feet in question, or upon any other definite line, as would be sufficient to establish by user a highway in the country. There was, undoubtedly, some little travel within the eighty feet, especially between Gratiot street and Jefferson avenue, but the Dequindre farm was for nearly the whole period an open common, and much of the Witherell farm also, for a large portion of the time, and the travel seems to have been anywhere, over or across the common, within and without the eighty feet, wherever the ground was best fitted for the purpose. The greater portion of the travel seems to have been between the time when the company took up their track from Jefferson avenue to Gratiot street and turned their road down the latter street, which was about 1842, and the time when they re-laid the track there, in 1851, when the ditches which had been made each side by the company, and the old road-bed and the culverts left there, rendered the road-bed itself, for much of the way, passable for teams; and when the travel was more nearly confined

to the eighty feet for this reason; but still passing on and off as occasion required, wherever it was found most convenient and without any reference to street lines. In fact, during almost the whole time down to 1852, there were very few houses near this strip of ground anywhere, and very little occasion for its use for purposes of travel.

And though the bill contains no averment of an acceptance by the city authorities of the alleged dedication, or even of any recognition of it by them during the period in question (and therefore such evidence, if it appeared, would hardly be in support of any case made by the bill), we have nevertheless looked carefully through all the evidence for the purpose of finding, if possible, any evidence showing an acceptance by the proper city authorities. But though we find that the subject was frequently brought before the council by petition of the inhabitants who owned property near the line and were interested in having a street there (and upon whose testimony the evidence of user mainly depends), and, though the Detroit and Pontiac Railroad was frequently complained of as a nuisance, for running across the streets of the city, and because they did not build the proper bridges, crossings or sidewalks across their track, and though they were notified by the council to build such bridges, we find no action of the council fairly showing any intention to accept the supposed dedication. We find that sidewalks along the streets crossing the railroad, and crosswalks across said railroad and the space in question, were ordered and were constructed. But we find no work ordered to be done upon the street, nor any sidewalks ordered constructed along the length of the street, nor any money appropriated or expended upon it.

· The space, or rather so much of it as was not occupied by the railroad, was *spoken of* generally, and generally known, by the name of "Dequindre street." And it was often men-

tioned by this name in the proceedings of the council in describing other streets and work to be done between certain points on other streets. This would be the natural result of the fact that the recorded plats designated the space by that name.

On the other hand it appears, we think affirmatively, that up to the time of the Watson deed (as late as it is material to inquire) the common council had not only *not* determined to claim the land as a street, but *had deliberately decided not to assert a claim to it* as a street, until the question should have been decided between other parties.

On the 5th of August, 1851, there was a report from the majority of a committee which had been appointed by the common council to inquire by what authority the Detroit and Pontiac Railroad Company have taken possession of Dequindre street, and also a report from the minority of the same committee. The report of the majority expressed the opinion that the street had been unequivocally dedicated to the public, and that it was the duty of the city, in its corporate capacity, to maintain its free use to the people of the city, and that the city should, at once, take steps to apply an effectual remedy. They, therefore, recommend that the city attorney be instructed forthwith to take such legal measures as will test the right of the company to the possession of the street. The minority report, without expressing any opinion upon the legality of the dedication, or the right of the public to it as a street, concludes that whether the company are entitled to it for their railroad, is a question of fact to be determined in a proceeding between them and the representatives of the deceased (Dequindre), in which the city cannot intervene. It then proceeds: "It may be added, also, that the question whether that street be a public highway, is a question of fact to which both the company and those representatives are

parties. No jury has ever been called by the city for the purpose of opening the street; *and the undersigned are unable to see in what way the city is peculiarly bound to claim it as such, more than private individuals.* If the persons aggrieved will take the trouble to lay the matter before the grand jury by way of indictment, for obstructing the supposed highway, the question whether it is one in fact may be easily settled, and without expense to the city. As the matter stands at present, the undersigned cannot recommend any action on the part of the common council."

Both these reports were referred to the city attorney, and, on the 15th day of August, 1851, the city attorney reports that he adopts as correct, the report of the minority of the committee; and this report was on the 26th day of August *adopted* by the council. Nothing in any way contravening this action was done by the council, up to the time, at least, when the railroad company obtained their deed from Watson.

Up to the time, then, when this deed was obtained from Watson, there had been no acceptance by the city of the alleged dedication. And whether the conditions of the agreement with Dequindre had been performed or violated by the company, we can see no reason to doubt that it would have been entirely competent, if not for Dequindre alone, at least for Dequindre with the consent of the company, to withdraw and put an end to the unaccepted dedication. Until acceptance, it was in the nature of a proposition, by which he could not be bound. And what it was competent for him to do in this respect, with the consent of the company, it would be equally competent for his heirs or any of his or their grantees, having the whole estate, to do.

As already stated, Dequindre, in October, 1836, had conveyed in trust for his creditors, to Peter J. Desnoyers, the

whole Dequindre farm, subject to his agreement with the railroad company, this conveyance being, in effect, more in the nature of an incumbrance or security for those debts, than of an absolute conveyance. But on the 7th day of May, 1845, the purposes of the trust, as we must infer, being satisfied, and any of the lands remaining, belonging in equity at least to the heirs of Dequindre, Desnoyers makes a general quit-claim deed to those heirs (Dequindre being dead) of all the said farm except such portions as had been previously sold. This, if any interest had originally passed to Desnoyers in this strip of land, operated as a conveyance or release of the legal title to such heirs, of what was before an equitable estate in them, after the satisfaction of the trust, and left the heirs in the same position with respect to this strip of land as Dequindre himself would have occupied if living and if he had never executed the deed of trust to Desnoyers (unless Desnoyers had in the mean time conveyed it, which is not pretended). Now, prior to the 27th day of December, 1851, all the right, title, interest and estate of all these heirs in this strip of land had been duly conveyed to John Watson, who, after such conveyance, occupied the same position in reference to the land, as Dequindre would then have occupied, if living. And the alleged dedication having never been accepted by the proper public authorities of the city, it was entirely competent, so far as the city or the public were concerned, for Watson and the company to rescind the agreement made by Dequindre. It was competent for Watson to convey to the company, and for the company to take the title to the strip of land in question, clear from any obligation to the public, which could have arisen from the proposed dedication. This is precisely what was done by the conveyance. This view renders it wholly unnecessary to inquire whether the company had forfeited their rights under the Dequindre agree-

ment, by a breach of any of its conditions, as the result would be the same, whether they had or not. .

But it was urged with much earnestness by complainant's counsel, that inasmuch as Dequindre and Desnoyers, and other parties deriving title under them, had sold lots according to, and referring to, these plats, and as Watson himself had thus sold lots, and all the lots had been thus sold before the deed from the heirs to Watson, all the parties through whom Watson claimed, and Watson himself, were thus estopped to deny the existence of this street as shown upon the plats; that it would be unjust and a fraud upon the lot-owners to permit the retraction of the dedication after they had thus purchased on the faith of the plats. This is a question which may arise between the lot-owners and the heirs of Dequindre, or, possibly, between them and the company. But whatever rights these lot-owners may have, are *private* rights, and cannot be adjudicated in this suit to which they are not parties; nor can those private rights be made the foundation of a public right in a suit brought by the city entirely in behalf of the public and for the sole purpose of securing a public right.—*Smith v. Lock, 18 Mich., 56.*

A question of much importance was raised by the defendants and very fully discussed by counsel on both sides, whether, supposing the case made by the bill to be maintainable in other respects, and to be established by the proof, the city, in its corporate capacity, was the proper or a competent party to bring this suit on behalf of the public.

But while we do not consider the rights of the city by any means clear upon the authorities, we have thought it best to express no opinion upon it, believing it better for the interests of all parties to consider and decide the case upon its merits.

The decree of the circuit court in chancery dismissing

the bill, must be affirmed, with costs to the defendant in both courts.

GRAVES and COOLEY, JJ., concurred.

CAMPBELL, CH. J., did not sit in this case.