### SWIFT *et al. v.* MAYOR etc. OF LITHONIA.

1. Where a dedication of his property to a public use is relied upon to defeat the claim of one holding the legal title, the acts relied upon to establish such dedication must be such as clearly showed a purpose on the part of the owner to abandon his own personal dominion over such property and to devote the same to a definite public use.

2. Except in so far as the premises sued for may include portions of a public road not claimed by the defendant under an alleged dedication by the plaintiffs' ancestor, the title of the plaintiffs was established; and the defense relied upon, to the effect that the premises sued for had been, by the ancestor of the plaintiffs, dedicated to the town for use as a public highway, was not sustained; and a general verdict in favor of the defendant was contrary to law, and upon a motion for a new trial should have been set aside.

Argued June 12, — Decided July 9, 1897.

Ejectment.   Before Judge Hart.   DeKalb superior court. August term, 1896.

On May 21, 1892, an action of ejectment was brought against the Mayor and Town Council of Lithonia, to recover possession of a quarter of an acre of land which had been taken possession of and was being occupied by defendant as a street; it being a strip ranging from 20 to 32 feet in width and about 393 feet long, lying southwest of and adjoining the right of way of the Georgia Railroad Co., and being originally a part of a body of land owned by John N. Swift, who derived title in 1846 from the Georgia Railroad Co.   The plaintiffs are his daughters, and derive title under his will, dated January 19, 1890, wherein he gave them "my lot on which I live at this time in said town of Lithonia."   He died on February 17, 1890, in possession of the lot so devised, and his executor put the plaintiffs in possession.   One of the plaintiffs testified, that on the strip in dispute were a large number of oak-trees growing near the main street toward the railroad and in front of the store-

house on the lot which had been occupied by Swift for many years. From the rear part of the store he had a trench or ditch running from the cellar across this strip to the land of the railroad, to carry off water from the cellar. Back of the storehouse were their barn, stables, and lot. Sometimes he had used this strip unenclosed on the outside of his lot with a way of carrying fertilizers to the cars on the railroad-track, and in going to and from his lot and store, passed across this strip. In 1888 defendant went upon said strip, cut down the trees, moved back the fence, and made a sidewalk along the fence from the main street up to Brand's place. At the commencement of this work, Swift went to where the town marshal and the workmen were, and protested against their going upon the lot and doing the work. From the minutes of the mayor and council of the town it appeared, that on October 11, 1888, the marshal was ordered "to move J. T. Brand's fence in front of his residence back to line of Georgia Railroad, and to straighten street and work sidewalk and cut trees in front of J. N. Swift's old storehouse and all work on said street to make it passable." Nunnally, who was the chairman of the council at the time, testified that the trees were cut down and the work done under the direction of the town authorities, and by their marshal, Norton; that Swift very forcibly protested against the work; and that witness told Norton of this, and advised him to be cautious in doing the work. Norton testified similarly, and as follows: He opened up the sidewalk along the Swift property and Brand's property. He commenced upon the lot of Brand, and required his fence to be moved back; and Brand made a great fuss and quarreled about changing his fence. After this he came on down across the Swift fence, making a sidewalk; and in making it straight, had to move back by order a rail fence of Swift, who said he wanted no trouble and did not want to make a fool of himself like Brand about the matter. He did not say anything to stop him in the work. He said, if they had the right to cut down his trees they could do so. After cutting the trees and reporting the matter to council, they told him to offer the wood to Swift. Swift refused to have it, and said, if the land was not his he had no right to the

wood, but if the property was that of the town then they were its trees. The other of plaintiffs testified, that the land between her father's enclosure and the road along the railroad was used in passing to her father's lot and barn beyond the street, and along a sort of pathway was an open space covered with weeds and grass, in which she and her brothers when children used to play; and across it was a ditch from the cellar of her father's storehouse, which emptied the water down in a hollow on the railroad land, which passed under the road in a culvert. Her father had used it in his lifetime in having a way from his lot where he manufactured fertilizers, to carry them to the railroad.

The defendant introduced six witnesses whose testimony was, in brief, as follows: The land in dispute has been used by the public for a great many (thirty or more) years. A road upon it was used and worked by the road-hands before the town was incorporated. Afterwards the town worked on this road, which turns off from the main street near the railroad-crossing, thirty or forty feet from the main track, and runs in a sort of zigzag way in a southeast direction from the town. This road is forty or fifty feet southwest of the main track of the railroad. Southwest of said main track is a sidetrack from the main track to the line where the storehouse stands near the main street. The trees cut down by the town in 1888 were between the store building and the road going from the storehouse in the direction of the railroad. They were ten to twenty feet from the store. In passing from the store and delivering goods therefrom, the public used to go in wagons between the store and the trees. This store building was burned not long before the death of Swift. Brand testified, that he lived on the lot next southwest of the Swift lot, on the street coming from the main street along the railroad toward his place. This street had been kept up and used by the public a great many years, running in front of his place and the Swift lot. Some time before the town opened the streets, the Georgia Railroad folks sent a man named Edwards to define the right of way, and to have people who were on it to move off or acknowledge that they were holding

it subject to the rights of the railroad. Part of this lot fence was over on the right of way of the railroad, and afterwards the town authorities had him to move back, and he moved his fence back and straightened the line and made a good sidewalk on along the Swift property to the main street.

· The verdict was for the defendant. Plaintiffs moved on the general grounds for a new trial, which was denied, and they excepted.

*Candler & Thomson*, for plaintiffs.

*R. W. Milner*, for defendant.

SIMMONS, C. J. 1. Where a dedication of his property to a public use is relied upon to defeat the claim of one holding the legal title to the property, the acts relied upon to establish such dedication must be such as clearly showed a purpose on the part of the owner to abandon his personal dominion over such property and to devote the same to a definite public use. "Intention to dedicate property to public use is essential to a dedication, but this may be proved by acts showing an assent that the property should be so used and enjoyed." *Collins* v. *Mayor etc. of Macon*, 69 *Ga.* 642; Indianapolis *v.* Kingsbury, 101 Ind. 200; Manderschid *v.* Dubuque, 29 Iowa, 73; Tinges *v.* Mayor etc. of Baltimore, 51 Md. 600; Mayor etc. of Baltimore *v.* White, 62 Md. 362; Detroit *v.* D. & M. R. R. Co., 23 Mich. 173; Rozell *v.* Andrews, 103 New York, 150; Civil Code, § 3591.

· "An *intent on the part of the owner to dedicate* is absolutely essential; and unless such intention can be found in the facts and circumstances of the particular case, no dedication exists. . . . The intention *may also be established by parol evidence* of acts or declarations which show an assent on the part of the owner of the land that the land should be used for public purposes. To deprive the proprietor of his land, the intent to dedicate must clearly or satisfactorily appear. Such *intent will be presumed* against the owner where it appears that the easement in the street or property *has been used and enjoyed by the public* for a period corresponding with the statutory limitation of real actions. But where there is no other evidence against the

owner to support the dedication but the *mere fact* of such user, so that the right claimed by the public is purely prescriptive, it is essential, to maintain it, that the user or enjoyment should be adverse, that it is with claim of right, and uninterrupted and exclusive for the requisite length of time. . . . But where the question is as to an *intent* on the part of the owner to dedicate, *user by the public* for a period less than that limiting real actions is important as evidence of such intention, and as one of the facts from which it may be inferred." 2 Dillon's Municipal Corporations (4th ed.), § 636 et seq.

In order to constitute a dedication of land to public uses, an intention on the part of the owner to abandon the use of the land to the public must be shown by proof of unequivocal and unambiguous words or acts of such owner;—the circumstances must be such as to show a clear assent to such dedication.    Irwin *v.* Dixion, 9 Howard, 9, and the many cases there cited.    The words or acts of the owner must clearly indicate an intention to dedicate the land to the use of the public, and there must be an acceptance by the public of such dedication. San Francisco *v.* Canavan, 42 Cal. 541; Shellhouse et al. *v.* The State, 110 Ind. 509.    See also *Mayor etc. of Macon* v. *Franklin,* 12 *Ga.* 239, where the subject of dedication generally is discussed.

2. It does not appear from the record of this case what part of the land sued for constitutes a portion of a public road which is shown to have been used as such for a very long period of time, and what portion is claimed under the alleged dedication by the ancestor of the plaintiffs.    As to this latter portion, we think that the evidence establishes the plaintiffs' title, and that the defense relied upon, to the effect that this portion had been, by the ancestor of the plaintiffs, dedicated to the town for use as a public highway, was not sustained by the evidence.    In so far as the verdict may have related to this land, it was contrary to law, and on motion should have been set aside.    There was no proof of any express dedication by the ancestor of the plaintiffs nor of any words or acts of his from which could have been implied an intent on his part to dedicate his land to the use of the community.    On the contrary,

the evidence seems to tend positively the other way, and is insufficient to uphold a verdict for the defendant. *Daniels* v. *Intendant etc. of Athens*, 55 *Ga.* 609; Fisk *v.* Havana, 88 Ill. 208; Miller *v.* Ancoma, 30 W. Va. 606.

The evidence was sufficient to authorize the finding in favor of the defendant as to that part of the land sued for which may have constituted portions of the public road referred to above. It was sufficient to authorize a finding that this road had been in use by the public for thirty years or more, and the prescriptive title of the defendant was made out by the proof. The record does not disclose which portions of the land sued for were part of this road and which portions were claimed under the alleged dedication; and the case is, therefore, sent back for a new trial.

*Judgment reversed. All the Justices concurring.*