*C. Henry & Rodney S. Cohen,* for defendant.

---

# MAYOR AND ALDERMEN OF THE CITY OF SAVANNAH
## *v.* STANDARD FUEL SUPPLY COMPANY.

1. Dedication to the public of a use of land for a street rests upon the intent of the owner to make such dedication. Where the dedication is not express, the acts of the owner relied upon to imply a dedication must be such as clearly indicate an intent to exclusively devote the property to use as a street.

2. Wharf property on a navigable stream is a place of a quasi-public character, to which the public are invited. The fact that, without intent to make a dedication, the wharf-owner permits its use by some of the public who do not come thereon for the purpose of transacting business, should not operate to defeat his title. In the absence of proof of express dedication and acceptance, such use by the public will be regarded as in the nature of a license, and of itself will be insufficient to raise an implication of its dedication as a street by the owner.

3. In such a case, where the wharf-owner retains dominion over and use of the dockyard, although he may permit the public to travel over it as if it were a part of the street longitudinally adjacent thereto for upwards of twenty years, such use by the public is so lacking in the

elements of adverseness and exclusiveness as to be insufficient to establish a prescriptive right thereto.

4. The facts examined and held insufficient to show that a street over the locus in quo existed, either from implied dedication or prescriptive use.

JULY 19, 1913.

Equitable petition. Before Judge Charlton. Chatham superior court. May 6, 1912.

*H. E. Wilson* and *David C. Barrow,* for plaintiff in error.

*R. R. Richards* and *Saussy & Saussy,* contra.

EVANS, P. J. The issue between the parties is whether a certain area in the City of Savannah is a part of River street. The controversy is between the owner of a wharf lot and the city. The wharf-owner was proceeding to build a structure on the locus in quo, and filed a petition to enjoin the city authorities from removing it as an obstruction of a public street. On the trial a nonsuit was refused; and after all the evidence was in, the court directed a verdict for the plaintiff. The evidence is very voluminous; great latitude having been allowed in its reception. We will not undertake a discussion of all of it, and will refer only to such portions as will serve to illustrate the legal propositions which must control the case. The City of Savannah does not claim ownership of the fee, or express dedication of the locus in quo as a street, but does claim that a street existed by prescription or by implied dedication and acceptance. The wharf-owner claims legal title to the land, and denies the city's claim of a street over any part of it.

In the original plan of the City of Savannah as laid off by General Oglethorpe, there was no River street. The Savannah river runs east and west along the northern boundary of the city. In the original plan of the city the lots along the river front extended southward over the high bluff as far as what is now known as Bay street, which runs parallel with the river. The streets of the city running north and south run down to the river, and at the foot of each street there is a public dock. The north and south streets which include the locus in quo are Lincoln and Abercorn; the wharf lot in controversy abutting Lincoln street. In the early maps of the city no street appears between the river and Bay street under the bluff. The deed to John David Mongin in 1821, from whom the plaintiff derives title, does not indicate any street along the bluff. In the muniments of title we first discover a reference to

a street in the deed from Stoddard to Willis, dated March 7th, 1864. In this conveyance lot # 1 in Reynolds ward is described as running back on its eastern boundary on Lincoln street 96 feet and 4 inches from the water line, and on the western boundary 88 feet and 4 inches; and lot # 2 Reynolds ward is described as running back on its eastern boundary from the water line 88 feet and 4 inches, leaving back of these two blocks (and two others) and between them and the buildings on the remaining portion of the lots the space of 20 feet in width, which is reserved as a street. The locus in quo is a part of lot # 1 of Reynolds ward. The wharf-owner contends that he is entitled to use all of lot # 1 as described in this and successive deeds down to him, which will leave a street of 20 feet width on the south side of the property. The city contends that it has acquired by prescription and implied dedication an expansion in the width of this street in front of the wharf property, so as to encroach upon it to the pillars of the wharf-shed and under the eaves,—nearly one-third of the area of the lot.

The evidence most strongly relied on by the city to establish its contention is, that about forty years ago it paved the locus in quo; that over twenty years ago a railroad company built a railroad track over the disputed territory under permission from the city to lay it on River street, which is now upon the property; and that upwards of twenty years the public has used it as a street. The evidence shows that wharf property is treated by the municipality very differently from other property. Many ordinances have been enacted in which quite extensive municipal control has been asserted by the city over wharves and wharf-lots owned by private individuals. They relate to regulations of dockage and wharfage, mode and manner of building and repairing such wharves, control of harbor lines, prohibiting the encumbering of wharves with cotton, coal, brick, lumber, etc., so as to prevent use of wharves by vessels wishing to load, and fixing the dockage rates and charges which the wharf-owner may make. Indeed, so broad was the power of superintendence of private wharf property asserted by the city that in 1866 the petition of the owners of this wharf to permit the use of it exclusively for steamships was refused by the city. It appears from the evidence that in 1867 the city paved the locus in quo with cobble-stones, and charged the cost of the pavement against

the dock and wharves account. When streets were paved as streets, a charge was made by the city against the street and lanes account; and if wharves were paved, the expense was charged against docks and wharves account. The cost of the paving of a wharf by the city was collectible from the wharf-owner. The evidence is silent as to whether or not the city reimbursed itself for the paving of this area from the wharf-owner, as it had the right to do under its ordinance. There was no curbing or sidewalk laid on the locus in quo, or other interference with an entrance from the 20-foot street to any part of the wharf lot. The pavement extended to the posts which supported the roof of the wharf-shed, and the eaves projected over it. During this time many steamers, including those of the New York and Philadelphia lines, used this wharf. It was one of the busiest spots in the city. The area in dispute was used by the patrons of the wharf in delivering and receiving freight. Busses and hacks were stationed on it for the reception of passengers; debris and rubbish were thrown upon a portion of it; and it was generally used by the wharf-owner in connection with business of the wharf, before and after the laying of the cobble-stones. In 1889 the Central Railroad and Banking Company constructed a track over a part of the wharf property, under permission of the municipality to lay it on River street. A spur-track also was built thereon for the use of the wharf. The spur-track extended beyond this property for the use of other wharf-owners, but has been discontinued in part. In the ordinance authorizing the construction of the railroad along River Street it was provided that "all damages that may be sustained by private individuals or corporations from the use and occupation of their property, in exercising the rights herein granted, shall be met and paid by said company." The evidence showed that Lincoln street sloped from the bluff to the water's edge; and that, most probably to avoid the expense of regrading and on account of a jog in a building on the east side of Lincoln street, the railroad was constructed upon the wharf front where the ground was more level, instead of upon the 20-foot street. The evidence does not disclose whether this was done with the assent or over the protest of the wharf-owner. The railroad track was used mostly for the handling of freight-cars, and frequently dead cars were left standing on the track on this area for a day or more at a time. Whatever may be the respective rights of the

railroad company and the wharf-owner inter sese, it is clear that the construction of a track along the wharf front under an ordinance granting permission to lay it upon a street, and exempting the city from damages if laid upon private property, is too inconclusive an act on which to base dedication or prescription of the wharf front occupied by the railroad as being a part of the street.

Since the paving of the wharf the general public had been accustomed to travel over the area covered by both the 20-foot street and that portion of the wharf lot which was paved. But the use by the public of the paved area on the wharf lot was never of such a character as to interfere with its use by the wharf-owner for his own business, or to indicate that the owner, by tolerating such use by the public, intended to dedicate his property to the public as a street. The owner paid the public taxes on the property, which were received by the city, without giving notice of any adverse claim; and the general trend of the testimony was, that the area in front of the shed on the wharf was left open, on account of the peculiar nature of wharf property, for use in connection with the owner's business upon the wharf.

The circumstances to which we have just alluded, as well as other matters embraced in the testimony, were insufficient to show an intent by the wharf-owner to dedicate any part of his property to a public use, or that the public authorities attempted to accept any such dedication, or that the use by the public was so adverse as to exclude the owner from the use of his own property. The idea of dedication to the public of a use of land for a public street depends upon the intent of the owner in some way to make such dedication. "The acts relied upon to establish such dedication must be such as clearly showed a purpose on the part of the owner to abandon his own personal dominion over such property, and to devote the same to a definite public use." *Swift* v. *Lithonia*, 101 *Ga.* 706, 710 (29 S. E. 12); *Irwin* v. Dixon, 9 Howard, 10 (13 L. ed. 25). In *Georgia Railroad &c. Co.* v. *Atlanta*, 118 *Ga.* 486 (45 S. E. 256), Mr. Justice Lamar, in discussing this proposition, said: "The case comes squarely within the rule applicable to squares and areas around stations, depots, wharfs, and other places of a quasi-public character, and to which the public at large are invited. The fact that streets or roads enter such open spaces from various directions, and that pedestrians and vehicles pass across the square for the

purpose of going from one road to another, does not of itself show that the space has been dedicated to a public use. . . The fact that, without intent to make a dedication, the company permits the land to be used by those who do not come thereon for the purpose of business with the company should not operate to defeat its title. Its indulgence ought not to be charged against it and used as a means of depriving it of property allowed to be enjoyed, but not intended to be given. That it does not capriciously warn off persons crossing the strip will not wipe out the effect of acts showing an intention to hold the property as its own. The public in a proper case may obtain the title by condemnation, if the other essential elements are present. But no law of force in this State intends to take private property for public purposes, without payment therefor; nor will this end be attained under the name of dedication where there has not been an express gift by the owner, or where his long continued acts have not indicated a purpose to set apart the property for the public good." The paving of the area, under the facts submitted, will be attributable to the municipality's regulatory control over this quasi-public property, rather than as an acceptance of an implied dedication. The Savannah river is a navigable stream, and the public authorities have from the earliest times exercised regulatory control of privately owned wharves on navigable waters. In this State the Railroad Commission is given jurisdiction over wharves and docks. Civil Code, § 2662. Had the municipality, as it had the right to do, compelled the payment of the amount expended for the pavement of this area, then of course no implication of dedication or acceptance could be implied from such an act. If the municipality failed to enforce its rights in this regard, then its pavement of the street will be deemed voluntary. It is of great significance that no gutters or sidewalks were constructed upon this area; that nothing was done by the city to prevent an easy approach to the shed; that the pavement was extended under the eaves of the roof of the shed; and that taxes were accepted by the city upon this very area as being a part of the wharf lot, without any notice from the municipality that it claimed an easement over it.

The doctrine of title by prescription is founded on the presumption of a right by grant or license to the easement, after twenty years of uninterrupted, adverse enjoyment. To authorize such

presumption from possession alone, the enjoyment must not only be uninterrupted for the space of twenty years, but it must be exclusive and adverse, and under a claim or assertion of right, and not by the consent or favor of another claimant or owner. The fact that the user has been adverse must exist in every such case, to authorize the necessary presumption. *Mitchell* v. *Rome,* 49 *Ga.* 19 (15 Am. R. 669) ; *McCoy* v. *Central Railway Co.,* 131 *Ga.* 382 (62 S. E. 297). In all cases of prescription the prescriber must show a possession hostile to that of the owner of the land. From the nature of wharf property the approaches must be kept open for the convenience of the owner and his customers. It would be inequitable to impose a public easement on the wharf-owner's property because he tolerated liberties from the public, which did not interfere with his private enjoyment. From a careful consideration of all the testimony we think the circumstances relied on to show dedication and prescription too inconclusive to deprive the wharf-owner of a part of his property.

Judgment affirmed. All the Justices concur.